Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000050
31-JAN-2020
08:54 AM

NOS. CAAP-17-0000050,
CAAP-16-0000813, AND CAAP-16-0000879 (CONSOLIDATED)

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

**CAAP-17-0000050**
CONNECTIONS NEW CENTURY PUBLIC CHARTER SCHOOL,
Applicant/Appellant/Appellant,
and
COMMUNITY BASED EDUCATION SUPPORT SERVICES,
Applicant/Appellant/Appellee,
v.
WINDWARD PLANNING COMMISSION, COUNTY OF HAWAII,
Appellee/Appellee
DEPARTMENT OF PLANNING, COUNTY OF HAWAII,
Respondent/Appellee/Appellee,
and
SANDRA SONG, JEFFREY GOMES, SIDNEY FUKE, TERENCE YOSHIOKA,
Intervenors/Appellees/Appellees

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 14-1-223)

AND

**CAAP-16-0000813**
CONNECTIONS NEW CENTURY PUBLIC CHARTER SCHOOL,
Applicant/Appellant/Appellee,
and
COMMUNITY BASED EDUCATION SUPPORT SERVICES,
Applicant/Appellant/Appellant,
v.
WINDWARD PLANNING COMMISSION, COUNTY OF HAWAII,
Appellee/Appellee
DEPARTMENT OF PLANNING, COUNTY OF HAWAII,
Respondent/Appellee/Appellee,
and
SANDRA SONG, JEFFREY GOMES, SIDNEY FUKE, TERENCE YOSHIOKA,
Intervenors/Appellees/Appellees

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 14-1-223)
AND

**CAAP-16-0000879**
CONNECTIONS NEW CENTURY PUBLIC CHARTER SCHOOL,
Applicant/Appellant/Appellant,
and
COMMUNITY BASED EDUCATION SUPPORT SERVICES,
Applicant/Appellant/Appellee,
v.
WINDWARD PLANNING COMMISSION, COUNTY OF HAWAII,
Appellee/Appellee
DEPARTMENT OF PLANNING, COUNTY OF HAWAII,
Respondent/Appellee/Appellee,
and
SANDRA SONG, JEFFREY GOMES, SIDNEY FUKE, TERENCE YOSHIOKA,
Intervenors/Appellees/Appellees

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 14-1-223)

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Leonard and Chan, JJ.)

In this consolidated appeal, Applicant-Appellant-Appellant Community Based Education Support Services (**CBESS**) (in CAAP-16-0000813) and Applicant-Appellant-Appellant Connections New Century Public Charter School (**Connections**) (in CAAP-16-0000879 and CAAP-17-0000050) (collectively, **Appellants**) appeal from the July 14, 2015 Decision and Order Affirming Windward Planning Commission [(**Planning Commission**)], County of Hawaii's Findings of Fact [(**FOFs**)], Conclusions of Law [(**COLs**)] and Decision and Order Denying Special Permit Application No. SPP 12-138 (**Order Affirming**), the October 2, 2016 First Amended Judgment, and the January 13, 2017 Second Amended Final Judgment[1]

---

[1] The parties initially appealed from a judgment entered on July 14, 2015. However, those appeals were dismissed by this court because that judgment was not an appealable final judgment. See Community Based Educ. Support Servs. v. Connections New Century Public Charter School, CAAP-15-0000556, 2016 WL 2943201 (Haw. App. Apr. 19, 2016) (order). The Circuit Court subsequently entered a First Amended Judgment on October 26, 2016, and then entered a Second Amended Judgment on January 13, 2017.

(**Final Judgment**), all entered in the Circuit Court of the Third Circuit (**Circuit Court**).[2]

I. BACKGROUND

Connections is a public charter school that operates an elementary and middle school in Hilo and a high school located just outside of Hilo. CBESS is a domestic non-profit corporation that supports and raises funds for Connections. Connections wishes to consolidate its campuses and so it sought to develop a new campus on 70.15 acres of land located within the State Land Use Agricultural District, at Ponahawai, Kūkūau 2nd, South Hilo, Hawai'i, commonly referred to as the "Kaūmana" area of Hilo (**Property**). Connections proposed to develop a charter school campus with dorm facilities, a number of school buildings, and other related improvements for students from kindergarten through twelfth grade (the **Development**).

In March of 2008, Connections obtained approval, in principle, for a direct lease of the Property for school purposes from the State Board of Land and Natural Resources (**BLNR**). A Direct Lease was issued by BLNR in January 2011.

On or about July 25, 2012, Connections and CBESS, as co-applicants, submitted their Special Permit Application No. SPP 12-138 (**Special Permit Application**) to the County of Hawai'i Planning Department (**Planning Department**). Public hearings on the Special Permit Application were scheduled and notices were provided to interested parties. The first public hearing was on November 9, 2012, at which time representatives for Connections,

---

[2] The Honorable Judge Melvin H. Fujino presided.

its experts, and interested surrounding property owners provided testimony and other evidence. At that time, no request was made for a contested case hearing before the Planning Commission. It appears that both the Planning Commission and Appellants believed at this point that there was no option for a contested case hearing because, as a result of the size of the Property, the final decision to approve or deny the special permit would be made by the State of Hawai'i Land Use Commission (**LUC**). The Planning Commission and Connections agreed to delay the vote on the Special Permit Application so that additional discussions could be conducted regarding traffic and other concerns with the proposal.

The second public hearing occurred on December 6, 2012. The Planning Commission noted that several outstanding items had been produced by Connections, including additional information regarding its anticipated water use calculations. However, Connections requested a continuance because the Attorney General's Office for the State of Hawai'i was taking over legal representation for Connections. The decision on the Special Permit Application was again delayed.

A third public hearing was conducted on January 10, 2013. At that time, a motion was made to deny the Special Permit Application, which was seconded. Because of various absences by members of the Planning Commission, no final vote was held, and the Planning Department and counsel for the Planning Commission were instructed to prepare proposed findings of fact and legal

conclusions denying the permit. Connections and CBESS would then have a chance to respond to proposed findings and conclusions.

Thereafter, in a letter issued by the Planning Department notifying the public that a fourth public hearing would be conducted regarding the Special Permit Application, the Planning Director informed the public that contrary to prior understanding, interested parties could intervene and demand contested case hearing procedures. As a result, the Planning Commission suspended the preparation of proposed findings of fact and conclusions of law.

At the fourth public hearing, held on March 7, 2013, the motion to deny the Special Permit Application was withdrawn. The Planning Commission received a petition to initiate a contested case from Intervenor-Appellee-Appellee Jeffrey Gomes (**Gomes**). Gomes was granted standing to intervene at the hearing, and the Planning Commission voted to retain a hearing officer to conduct the contested case hearing.

The Honorable Sandra Pechter Song (ret.) was retained to serve as the hearing officer (**Hearing Officer**) for the contested case. Hearings were held over five days on October 21, 2013, October 22, 2013, November 12, 2013, January 8, 2014, and January 22, 2014. The Hearing Officer submitted a Hearing Officer's Report (**Report**) to the parties and the Planning Commission on April 7, 2014. The Report concluded that the Special Permit Application should be denied. CBESS and Connections submitted Joint Exceptions to Hearing Officers [sic]

Report, Finding of Fact, Conclusions of Law and Recommendation. The Planning Director also submitted exceptions to the Report.

The Planning Commission conducted its fifth public hearing on May 1, 2014, and voted to uphold the Report and to deny the Special Permit Application. On May 12, 2014, the Planning Commission issued its final FOFs, COLs and Decision and Order (**Decision and Order**).

Connections and CBESS appealed the Planning Commission's Decision and Order to the Circuit Court. After hearing arguments on the matter, the Circuit Court issued its Order Affirming and, ultimately, the Final Judgment affirming the Planning Commission's denial of the Special Permit Application. Connections and CBESS timely filed notices of appeal.

II. POINTS OF ERROR

CBESS frames its points of error as contending that the Circuit Court and the Planning Commission clearly erred in adopting the Planning Commission's FOFs 9, 14, 18, 21, 36, 46-55, and 59, erred in adopting the Planning Commission's COLs 4 and 5, and clearly erred in adopting the mixed factual findings and legal conclusions stated in FOFs 62 and 63. These findings and conclusions primarily pertain to traffic, water supply, the focus on the immediate vicinity, as opposed to the larger community, suitability for agricultural use, and compatibility with the General Plan. CBESS also argues that the procedures followed by the Planning Commission denied it due process.

Connections raises eight points of error, contending that: (1) the Circuit Court erred when it based its decision on

a presumption as to the validity of the Planning, Commission's decision and the Appellants' "heavy burden" of demonstrating that the decision was invalid because it was unjust and unreasonable in its consequences; (2) the Planning Commission erred in its application of Planning Commission Rule 6-3(b)(5)(A)-(G) to the Special Permit Application and the Circuit Court erred in affirming the Planning Commission's application of the rule; (3) the Circuit Court erred in affirming the Planning Commission's determination regarding building setbacks and roadway improvements; (4) the Circuit Court erred in affirming the Planning Commission's determination regarding the burden on the County's water supply; (5) the Circuit Court erred in affirming the Planning Commission's determination regarding the needs of the immediate community and the location of the school; (6) the Circuit Court erred in affirming the Planning Commission's determination regarding suitability for agricultural use; (7) the Circuit Court erred in affirming the Planning Commission's determination regarding consistency with the General Plan; and (8) the Circuit Court erred in affirming the Planning Commission's determination that, *inter alia*, Appellants had not demonstrated "how the development of a regional charter school on the Property that does not specifically service the needs of the immediate community and that is overwhelmingly objected to by the immediate community is a reasonable site for this facility."

III. APPLICABLE STANDARD OF REVIEW

On this secondary appeal, this court applies the following standards:

The standard of review is one in which the appellate court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in [Hawaii Revised Statutes (**HRS**)] § 91-14(g) (1993) to the agency's decision.

HRS § 91-14, entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).

Kolio v. Haw. Pub. Hous. Auth., 135 Hawai'i 267, 270-71, 349 P.3d 374, 377-78 (2015) (citations and brackets omitted).

When determining whether an agency abused its discretion pursuant to HRS § 91-14(g)(6), the court must first determine whether the agency determination under review was the type of agency action within the boundaries of the agency's delegated authority. If the determination was within the agency's realm of discretion, then the court must analyze whether the agency abused that discretion. If the determination was not within the agency's discretion, then it is not entitled to the deferential abuse of discretion standard of review.

In regards to the abuse of discretion standard of review, this court has held that agency determinations, even if made within the agency's sphere of expertise, are not presumptively valid; however, an agency's discretionary determinations are entitled to deference, and an appellant has a high burden to surmount that deference. This court has further described an agency's proper exercise of discretion as not arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result. Therefore, a hearings officer abuses his or her discretion when he or she clearly exceeds bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.

Id. at 271, 349 P.3d at 378 (citations, quotation marks, and brackets omitted).

IV. DISCUSSION

    A. Due Process

        CBESS argues that its due process rights were violated through the procedures utilized by the Planning Commission.

        Following the submission of the Special Permit Application, three public hearings were initially conducted by the Planning Commission. During these hearings, the Planning Commission heard the testimony of numerous witnesses, including experts testifying on behalf of Appellants, in addition to evidence from other interested parties. A motion to deny the Special Permit Application was made and seconded at the third hearing, but no vote occurred due to a lack of a quorum and so that findings of fact and conclusions of law could be drawn up for review by all members of the Planning Commission before a final vote. After the third public hearing, the Planning Commission apparently learned that a mistake had been made and that Appellants, or other parties with standing, had the right to demand a contested case hearing. A letter was issued to interested parties relaying this information. At the fourth public hearing, a request was made by Gomes to initiate a contested case. The motion to deny the Special Permit Application was withdrawn, and the matter continued to a contested case with the appointment of the Hearing Officer, with the testimony of numerous witnesses and the consideration of additional evidence from all parties. After receiving the Report

of the Hearing Officer and Appellants' responses thereto, the Planning Commission voted to deny the Special Permit Application.

CBESS argues that this procedure violated its due process rights in that the Planning Commission's decision "had already been predetermined" and the Planning Commission's "process was meaningless." CBESS further argues that the procedures that the Hawai'i Supreme Court found violated due process in Mauna Kea Anaina Hou provide guidance in this case. See Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai'i 376, 363 P.3d 224 (2015). In Mauna Kea Anaina Hou, BLNR voted at the same public meeting to both approve an application and permit and to hold a contested case hearing. Id. at 383-84, 363 P.3d at 231-32. On appeal, the supreme court held that BLNR's decision to approve a permit prior to a contested case hearing violated appellants' due process rights. Id. at 388-91, 363 P.3d at 236-39. The Supreme Court further held that the approval of both the permit and contested case procedures at the same time denied the appellants a meaningful opportunity to be heard in both reality and appearance. Id. at 391, 363 P.3d at 239.

In the present case, however, no vote to deny or approve the Special Permit Application was conducted before the contested case hearing. Instead, a motion to deny the Special Permit Application was made and seconded, but the vote on the permit was then delayed. A final vote on that motion was never taken; rather the motion was withdrawn, and a contested case was scheduled. The Planning Commission's action on the Special

Permit Application was after the completion of contested case proceedings.

We note that in a subsequent case, Kilakila 'O Haleakalā v. Bd. of Land & Nat. Res., 138 Hawai'i 383, 382 P.3d 195 (2016), at the first public hearing regarding the permitting of a Maui telescope, Kilakila requested a contested case hearing. Id. at 397, 382 P.3d at 209. Without granting the request for a contested case hearing, BLNR approved the first permit for construction of the telescope, and Kilakila successfully appealed that decision. Id. The first permit was subsequently made void by stipulation. Id. at 397-98, 382 P.3d at 209-10. However, while the appeal of the first permit was pending, BLNR granted Kilakila's request for a contested case hearing and after that proceeding concluded, BLNR issued an order approving a second permit for the construction of the telescope. Id. at 398, 382 P.3d at 210. One of Kilakila's claims on appeal regarding the issuance of the second permit was that BLNR had violated its due process rights because BLNR had voted on the first permit for construction prior to the contested case hearing; essentially, Kilakila argued that BLNR had prejudged the granting of the second permit before the contested case proceedings. Id. The supreme court rejected that argument and concluded that, since the first permit was voided, "appellants' due process rights were adequately protected by the contested case hearing and subsequent vote by BLNR." Id.

In this case, even though the case proceeded initially without a contested case hearing being held, no vote was taken by

the Planning Commission on the Special Permit Application before the contested case proceedings were completed and the Planning Commission was provided the report therefrom. The motion to deny cannot be considered a vote on the Special Permit Application. Moreover, the subsequent withdrawal of that motion was followed by full contested case procedures and then a vote. As in Kilakila 'O Haleakalā, we conclude that CBESS's due process rights were adequately protected by the contested case hearing and the subsequent vote by the Planning Commission.

Thus, we reject CBESS's claim that the procedures utilized by the Planning Commission violated its due process rights.

B.    The Circuit Court's Standard of Review

Connections argues that the Circuit Court used the wrong standard of review in affirming the Planning Commission's Decision and Order and that this constitutes reversible error requiring a remand to the Circuit Court. In affirming the Planning Commission's Decision and Order, the Circuit Court stated:

> The Court's review of the Commission's Decision and D&O is qualified by the principle that an agency's decision carries a presumption of validity and applicants have the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

Connections is correct that the standard set forth above is not applicable here. The supreme court has instructed that: (1) the "unjust and unreasonable" language quoted above only applies to review of decisions in the Public Utilities Commission ratemaking context; and (2) an agency's decision does

not have a presumption of validity; rather, the agency's discretionary determinations are entitled only to deference. See Paul's Elec. Serv., Inc. v. Befitel, 104 Hawai'i 412, 418-19, 91 P.3d 494, 500-01 (2004). Agency decisions are generally considered under the abuse of discretion standard applicable to all discretionary decisions of lower tribunals: "[G]enerally, to constitute an abuse it must appear that the [agency] clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Id. at 419, 91 P.3d at 501 (internal quotation marks and citation omitted).

However, the Circuit Court correctly articulated the standards of review with respect to the Planning Commission's factual findings, the clearly erroneous standard, and its conclusions of law, de novo review. See Diamond v. Dobbin, 132 Hawai'i 9, 24, 319 P.3d 1017, 1032 (2014). Notwithstanding the Circuit Court's error in its standard of review, based upon our own standard of review, this court can proceed to "review the court's findings of fact under the 'clearly erroneous' standard and its conclusions of law under the de novo standard, without any particularized presumption of validity or need to consider whether the agency's decision was 'unjust and unreasonable.'" Id. Therefore, the Circuit Court's error is harmless.

C. The Special Permit Requirement

Appellants were required to obtain a special permit for the Development because the Property is located in a state agricultural district and a school is not a permitted use under

HRS § 205-4.5 (2013 Supp.), which lists permissible uses within state agricultural districts. HRS § 205-6 (2017) delegates authority to the county planning commissions to adopt procedures governing the issuance of special permits and states, in relevant part:

> (a) Subject to this section, the county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified. Any person who desires to use the person's land within an agricultural or rural district other than for an agricultural or rural use, as the case may be, may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired.
>
> . . . .
>
> (c) The county planning commission may, under such protective restrictions as may be deemed necessary, permit the desired use, but only when the use would promote the effectiveness and objectives of this chapter.
>
> . . . .
>
> (d) Special permits for land the area of which is greater than fifteen acres or for lands designated as important agricultural lands shall be subject to approval by the land use commission. The land use commission may impose additional restrictions as may be necessary or appropriate in granting the approval, including the adherence to representations made by the applicant.

(Emphasis added.)

Therefore, in considering whether to approve a special permit, the Planning Commission must find that (1) the special permit is for an "unusual and reasonable use" within the agricultural district and (2) the permit would "promote the effectiveness and objectives of [HRS Chapter 205]." Id. As this court has previously recognized, "[t]he Hawaiʻi Supreme Court has ruled that the 'overarching purpose' of HRS Chapter 205 is to 'protect and conserve natural resources and foster intelligent, effective, and orderly land allocation and development.'" Kauai Springs, Inc. v. Planning Comm'n of Cty. of Kauai, 130 Hawaiʻi

14

407, 426, 312 P.3d 283, 302 (App. 2013) (**Kauai Springs I**)

(quoting Curtis v. Bd. of Appeals, Cty. of Hawai'i, 90 Hawai'i

384, 396, 978 P.2d 822, 834 (1999)).

The Hawai'i Supreme Court has explained the rationale

for the special permit as follows:

> The special use or exception evolved as a land use control device from a recognition of the hardship frequently visited upon landowners due to the inherent rigidity of the Euclidean zoning system, and of the inapplicability of variance or boundary amendment procedures to all land use problems. [3 A. Rathkopf, The Law of Zoning and Planning, § 41.03 at 41-8 to 41-10 (4th ed. 1981 & Supp. 1981)]; 3 R. Anderson, American Law of Zoning § 19.01 at 358-59 (2d ed. 1977). Unlike a district boundary amendment, which is analogous to a rezoning in its effect of reclassifying land, and unlike a variance, which permits a landowner to use his property in a manner forbidden by ordinance or statute, a special permit allows the owner to put his land to a use expressly permitted by ordinance or statute on proof that certain facts and conditions exist, without altering the underlying zoning classification. Its essential purpose, as explained by the state Attorney General, is to provide landowners relief in exceptional situations where the use desired would not change the essential character of the district nor be inconsistent therewith. 1963 Op. Att'y Gen. 63-37. "By the use of the special use permits, the broad division of uses in terms of residential, commercial, and industrial, and subdivisions of each, can be supplemented by requiring a use which falls conveniently within a class assigned to a particular district, but which has singular characteristics which may be incompatible with some uses of such class, to submit the [use to] administrative scrutiny, to meet certain standards, and to comply with conditions." 3 R. Anderson, supra § 19.01 at 359.

Neighborhood Bd. No. 24 (Waianae Coast) v. State Land Use Comm'n,

64 Haw. 265, 270-71, 639 P.2d 1097, 1101-02 (1982).[3]

Guidelines have been adopted, pursuant to HRS chapter

205, that require the Planning Commission to consider the

following criteria in determining whether a proposed use within

an agricultural district is an "unusual and reasonable use":

---

[3] Although HRS § 205-6 has been amended since the Waianae Coast case was published, it does not appear that the changes affect the rationale for the special permitting process, as stated by the supreme court in that case. See, e.g., Curtis, 90 Hawai'i at 397, 978 P.2d at 835 (discussing 1998 version of HRS § 205-6); Conf. Comm. Rep. No. 131, in 1998 Senate Journal, at 801 (same); Conf. Comm. Rep. No. 175, in 2005 Senate Journal, at 1080 (discussing 2005 amendments).

(1)  The use shall not be contrary to the objectives
     sought to be accomplished by chapters 205 and
     205A, HRS, and the rules of the commission;
(2)  The desired use would not adversely affect
     surrounding property;
(3)  The use would not unreasonably burden public
     agencies to provide roads and streets, sewers,
     water drainage and school improvements, and
     police and fire protection;
(4)  Unusual conditions, trends, and needs have
     arisen since the district boundaries and rules
     were established; and
(5)  The land upon which the proposed use is sought
     is unsuited for the uses permitted within the
     district.

Hawaiʻi Administrative Rules (**HAR**) § 15-15-95(b) (eff. 2000).[4]

These guidelines have been incorporated into the County

of Hawaiʻi Planning Commission Rules of Practice and Procedure

Rule (**Planning Commission Rule**) 6-3(b)(5)(A)-(E) (2016),[5] which

---

[4]     HAR § 15-15-95 has since been amended.  At the time the Special
Permit Application was filed, HAR § 15-15-95 stated, in relevant part:

> **§ 15-15-95 Petition before county planning commission.**
> (a) Any person who desires to use land within an
> agricultural or rural district for other than a permissible
> agricultural or rural use may petition the county planning
> commission within which the land is located for a special
> permit to use the land in the manner desired.  Special
> permits for areas greater than fifteen acres require
> approval of both the county planning commission and the
> commission. . . .
>     (b)    Certain "unusual and reasonable" uses within
> agricultural and rural districts other than those for which
> the district is classified may be permitted.  The following
> guidelines are established in determining an "unusual and
> reasonable use":
> (1)  The use shall not be contrary to the objectives
>      sought to be accomplished by chapters 205 and
>      205A, HRS, and the rules of the commission;
> (2)  The desired use would not adversely affect
>      surrounding property;
> (3)  The use would not unreasonably burden public
>      agencies to provide roads and streets, sewers,
>      water drainage and school improvements, and
>      police and fire protection;
> (4)  Unusual conditions, trends, and needs have
>      arisen since the district boundaries and rules
>      were established; and
> (5)  The land upon which the proposed use is sought
>      is unsuited for the uses permitted within the
>      district.
> . . . .

[5]     Planning Commission Rule 6-3 states, in relevant part:

(continued...)

set forth the criteria that must be considered by the Planning

Commission when an application for a special permit is sought:

> (A)   Such use shall not be contrary to the objectives sought to be accomplished by the Land Use Law and Regulations;
>
> (B)   The desired use shall not adversely affect surrounding properties;
>
> (C)   Such use shall not unreasonably burden public agencies to provide roads and streets, sewers, water, drainage, school improvements, and police and fire protection;
>
> (D)   Unusual conditions, trends, and needs have arisen since the district boundaries and regulations were established;
>
> (E)   The land upon which the proposed use is sought is unsuited for the uses permitted within the district[.]

---

[5](...continued)
> 6-3 Petition and Content
>
> A petition for a Special Permit shall be filed with the Commission's office and shall include the following:
>
> . . . .
>
> (b)   Original and twenty copies of:
>
> > . . . .
> >
> > (5)   A statement of the reasons for the granting of the Special Permit citing how the proposed use would promote the effectiveness and objectives of chapter 205, HRS, and why the proposal is an unusual and reasonable use of the land. The following criteria shall also be addressed:
> >
> > > (A)   Such use shall not be contrary to the objectives sought to be accomplished by the Land Use Law and Regulations;
> > >
> > > (B)   The desired use shall not adversely affect surrounding properties;
> > >
> > > (C)   Such use shall not unreasonably burden public agencies to provide roads and streets, sewers, water, drainage, school improvements, and police and fire protection;
> > >
> > > (D)   Unusual conditions, trends, and needs have arisen since the district boundaries and regulations were established;
> > >
> > > (E)   The land upon which the proposed use is sought is unsuited for the uses permitted within the district;
> > >
> > > (F)   The proposed use will not substantially alter or change the essential character of the land and the present use; and
> > >
> > > (G)   The request will not be contrary to the General Plan, and official Community Development Plan and other documents such as Design Plans.

Planning Commission Rule 6-3(b)(5)(A)-(E); see also Planning Commission Rule 6-7 (grounds for special permit). Two additional criteria have been adopted in the Planning Commission's rules regarding the Planning Commission's consideration of a special permit. They are as follows:

> (F) The proposed use will not substantially alter or change the essential character of the land and the present use; and
> (G) The request will not be contrary to the General Plan and official Community Development Plan and other documents such as Design Plans.

Planning Commission Rule 6-3(b)(5)(F)-(G); see also Planning Commission Rule 6-7 (grounds for special permit).

We consider Appellants' many challenges to the Planning Commission's FOFs and COLs in the context of the Planning Commission's rules.

1.  *Affect on Surrounding Properties*

Planning Commission Rule 6-3(b)(5)(B) provides that the "desired use shall not adversely affect surrounding properties." CBESS challenges FOF 18, which states:

> 18. Notwithstanding the findings of the [Traffic Impact Analysis Report (**TIAR**)] and the recommendations of the Police Department and Department of Public Works, the area residents uniformly expressed concerns about the adverse traffic impact of the Development along Edita Street and Kaūmana Drive. Also, residents objected that the TIAR was four years old and the traffic counts contained in the TIAR were taken when certain schools were not in session.

CBESS and Connections both challenge FOFs 46 and 47, which state:

> 46. Based upon the testimony from surrounding and neighboring property owners, the Development will have an adverse effect on surrounding properties by creating noise, traffic, and impacting the quality of life of the adjoining residents.

> 47. Measures proposed by Connections, regarding the establishment of building setbacks and roadway improvements to Edita Street do not appear to be sufficient to mitigate

the overwhelming concerns raised by surrounding property owners.

Appellants do not contest FOF 17, which states:

> 17. A [TIAR] dated June 28, 2010, was prepared in conjunction with the Connections application for the purpose of evaluating the Development's impact at the Development's entrance at Edita Street and at the Edita and Kaūmana Drive intersection. Based upon traffic counts taken on May 28, 2009, the TIAR found that the current level of service or LOS [(LOS)] operates as LOS "A" or "B", meaning that the traffic service is uncongested. The TIAR also concluded that upon full build-out of the Development, the LOS will continue to operate at levels "A" or "B". Although the TIAR concludes that traffic will not be adversely affected by reason of the Development, the County Department of Public Works recommended that a separate left turn lane onto the Development from Edita Street should be constructed to alleviate congestion, and that Connections should prepare a comprehensive traffic management plan for the Development.

On appeal, Appellants argue that the Planning Commission clearly erred in determining that there would be an adverse effect on the surrounding properties. The Planning Commission submits that there is substantial evidence that the Development would create and exacerbate "traffic concerns – quantity, quality, and safety." Gomes points to the Planning Commission's arguments.

Appellants presented expert testimony from, and the TIAR prepared by, Phillip J. Rowell (**Rowell**), a Civil Engineer with decades of experience in transportation and traffic engineering across the State of Hawai'i, as well as earlier traffic and transportation engineering experience in numerous mainland states, Malaysia, and Hong Kong.[6]

Rowell testified regarding the industry standards that must be used in preparing a TIAR, including that the TIAR

---

[6] Appellants also presented, *inter alia,* expert testimony from Ron Thiel, the Chief of the Traffic Division for the County of Hawai'i, also a Civil Engineer, who has been practicing traffic engineering with decades of traffic engineering experience.

prepared by him in this case complied with those standards and that the testimony and informational reports submitted by community members and Development opponents did not follow any of the standard procedures and criteria guidelines. Rowell testified that, based on his study, as reflected in the TIAR, all traffic control movements at the intersection of Edita Street and Kaūmana Drive would operate well above the minimum acceptable standard for an urban area, which he considered to be "pretty good operating conditions" upon completion of the project. Rowell nevertheless made a number of recommendations, including new surveys and traffic counts at the completion of the final phase of the project to confirm assumptions and to determine if additional mitigation would be required. He also recommended a "left-turn pocket" into the Property to minimize any impact to the community, even though the LOS was already at A, the highest level, or B.

Rowell acknowledged that, by the time of the contested case hearing, the TIAR was four years old and, if the Development moved forward to LUC, in his experience, the LUC would require an updated study. He agreed with the statement that the TIAR should be updated at some point and said he recommended that. On cross-examination, Rowell stated that the timing of the traffic counts was scheduled to get the counts before the public schools took summer break. He acknowledged that the Kamehameha Schools Hawai'i campus term ended a week earlier, but opined that that campus would impact traffic on Kaūmana Drive very slightly. He

20

also acknowledged that any new development projects in the area proposed after 2010, or 2009 when he did his data collection, would not be reflected in the TIAR. Rowell did not talk to area residents about traffic and road conditions. Rowell testified that none of the projects or potential projects identified on cross-examination would cause him to change the conclusion of the study, even though it might change the data.

Notwithstanding Rowell's testimony and the TIAR Report, as well as the other testimony and evidence presented by Appellants concerning traffic impact and management, numerous community members submitted written and oral testimony that support the challenged findings regarding adverse traffic impacts. This testimony did not simply state generalized concerns about traffic and was based on years, and in some cases decades, of experiences of living on Edita Street, Kaūmana Drive, and other streets in close proximity to the Property. Testimony included descriptions of current traffic and road conditions as already being problematic in various ways, including sharp turns, frequent speeding, a high accident rate, and a steep approach on Kaūmana Drive above Edita Street. Kaūmana Drive was described as a winding, narrow road with short sight distances and no shoulders in most areas. Testimony was given that Kaūmana Drive was already a very dangerous, narrow, two-lane road, by a witness who reported having seen numerous accidents in the area. The road and traffic conditions were said to already get worse when it rains. Another witness testified that, going back down into

Hilo town from that area, there was already back up and delays at the nearby Ainakoa and Kaūmana intersection. It was reported that the area already has high traffic in the morning. Testimony was given that there was a long history of traffic accidents at Kaūmana Drive and Edita Street and on the road just mauka of this intersection, which "cannot handle" additional traffic. This area of Kaūmana Drive was described as already being a "traffic hazard." It was pointed out that it rains a lot in Hilo. Some area residents expressed concerns based on recent residential developments and related increases in traffic that have occurred since the TIAR was completed. Notwithstanding the proposed traffic mitigation including, but not limited to, encouraging carpooling, construction of a turn pocket, and campus design to facilitate traffic flow at drop off and pick up times for cars and busses, there was evidence that the Development would eventually accommodate hundreds of students, plus dozens of faculty members, and support staff.

We reject Appellants' contention that expert testimony in opposition to the Development was required for the Planning Commission to find that Connections failed to meet its burden to show that increased traffic from the Development would not have an adverse impact on the surrounding properties. As noted above, it was Connections's burden to show no adverse effect; the Planning Commission was not persuaded by the TIAR and the related testimony submitted by Connections. See 2 Am. Law. Zoning § 14:14, Traffic and congestion criteria (5th ed.), Westlaw

(database updated November 2019) ("Special use permits can also be denied if the applicant fails to submit information required for the board to accurately assess traffic impacts."). In addition to testimony from community members, the record includes a report from the County police department to the Planning Commission, which concluded that the impact of the Development would likely include increased noise and traffic in the area and that without the addition of sidewalks, the Development would make Edita Street unsafe for pedestrian traffic.

On the record in this case, we cannot conclude that the Planning Commission clearly erred in adopting FOFs 18, 46, and 47, and concluding that, even with the proposed traffic mitigation efforts, traffic stemming from the Development would have an adverse effect on surrounding properties.

2.    *Burden on Public Utilities*

Planning Commission Rule 6-3(b)(5)(C) provides that the proposed use "shall not unreasonably burden public agencies to provide roads and streets, sewers, water, drainage, school improvements, and police and fire protection." CBESS challenges the following FOFs with regard to the Development's proposed water usage:

> 21.    The available water from the County of Hawai'i municipal water system is insufficient to support the first phase of the Development.
>
> .    .    .    .
>
> 48.    There is insufficient water available from the County system to service the Development. Therefore, to allow the Development would unreasonably burden the

Department of Water Supply to provide water for its facilities.

49.  There is no evidence that Connections has the ability to develop a potable water source as a mitigating measure, previously proposed by the Director.

50.  A mitigating measure previously proposed by the Director of limiting the number of students to the amount of potable water available to the project is not reasonable because Connections is proposing to construct a high school for 107 students [in] its first phase, when the potable water available would only allow for 70 students.

Both Connections and CBESS challenge FOF 51, which states:

51.  As such, the proposed use may unreasonably burden the County Department of Water Supply to provide water to the Development.

Appellants acknowledge that the maximum potable water allocation by the Department of Water Supply (**DWS**) for the Development was 4,200 gallons per day (**gpd**), which is significantly less than the estimated water needs of the Development, upon completion of all phases of the Development, as proposed in the Special Permit Application. Connections's expert, who created a report for the Development's estimated water usage, calculated that the water requirements for the Development's final phase of construction would require between 6,858 and 10,828 gpd. Additional estimates were created for the Development at different phases of its construction, and the expert concluded that the 4,200 gpd limit of potable water would be exceeded in Phase 7 (of 9) when the elementary school and cafeteria would be constructed and an additional source of

24

potable water would be needed.[7] Based on the development plan, this would not occur until between ten and sixteen years into construction.

Connections suggested that an additional condition of approval be added to the Planning Department Director's (**Planning Director's**) favorable recommendation on the Special Permit Application that would essentially limit the number of persons at the Development to the potable water that could be obtained through a combination of the water available from DWS combined with whatever other sources could be developed by Connections. The Planning Director testified that final water use figures are not usually required at the special permit application stage and would normally be addressed through conditions attached to the special permit approval.

It is unclear how the Planning Commission reached its conclusion that the 4,200 gpd water usage allowance from DWS could only support 70 students. The Planning Commission states it is using a 60 gpd per student standard, but the Planning Commission and the parties have failed to identify where that figure came from. There was no finding that the report submitted by Connections's expert showing significantly less water usage

---

[7] The Special Permit Application stated that, at the time of the application, a "definitive solution" was not evident, but that potential additional sources of potable water might be a rain catchment system, a potable water well, or possibly a future joint-developer agreement whereby Connections might be able to gain additional "water credits." Connections submitted that, since there was a one to two decade period before the DWS allotment would be reached, there was ample time to identify and assess feasibility of other sources and secure the necessary permits. Otherwise, campus development would not proceed beyond what could be sustained by the 4,200 gpd allotment.

was not credible. There is simply nothing in the Planning Commission's Decision and Order or the briefing before this court that explains or supports that calculation. It is contrary to the only evidence provided in the contested case hearing. The failure by the Planning Commission to explain its reasoning prevents this court from providing meaningful review. See Kauai Springs, Inc. v. Planning Comm'n of Cty. of Kaua'i, 133 Hawai'i 141, 164, 324 P.3d 951, 974 (2014) (**Kauai Springs II**) (an agency's findings should allow the reviewing court to track the steps by which the agency reached its decision).

The evidence in the record showed (1) the Development was to be constructed in phases and the first six phases could be supported by the potable water made available by DWS, (2) there were proposals made by Connections to secure additional potable water without burdening DWS, and (3) Connections agreed to limit the number of persons at the Development to the potable water limit made available by DWS in addition to whatever other sources it could itself secure. There is nothing in the record to suggest that Connections would not or could not be held to its commitments. FOFs 21, 48, and 50 are clearly erroneous and not supported by the evidence. FOF 49 is not clearly erroneous, as there was no definitive evidence in the record that Connections would be able to develop potable water sources. However, the Planning Commission may reconsider any weight it assigned to this finding in light of the Planning Director's testimony regarding the burden placed on applicants for special permits at this stage

26

and Connection's agreement to limit the number of persons on the campus to the amount of water it can obtain.[8] COL 51 is also vacated in light of the above.

3.  *Unusual Conditions, Trends, and Needs*

Planning Commission Rule 6-3(b)(5)(D) provides that the Planning Commission should consider whether "[u]nusual conditions, trends, and needs have arisen since the district boundaries and regulations were established." CBESS challenges FOF 14, which states:

> 14.  The Development does not propose to establish a charter school on the Property to serve the needs of the immediate vicinity in the Kaūmana area of Hilo, although some students from the area may attend this school.

Both CBESS and Connections challenge FOF 52, which states:

> 52.  Unusual conditions and needs have arisen since the establishment of this land use district in the 1970s, because the area in which the Property is located has essentially become residential in character. Also, the County General Plan LUPAG map recognizes this trend by designating the area for low density urban use. However, there was no evidence presented to demonstrate that location of a school that is not intended to specifically service the needs of the immediate community is such an unusual condition, trend or need that justifies location of the Development at this location.

It does not appear that the underlying factual issues are in dispute here. As reflected in part in FOF 14,

---

[8] The Planning Commission's Answering Brief appears to treat the traffic issues referred to previously when addressing adverse effects on the surrounding community as an additional basis for finding that issuing the Special Permit would be a burden on a public agency. No such finding was made by the Hearing Officer or the Planning Commission. The only basis stated in the Planning Commission's Decision and Order for finding a burden on a public agency was with respect to the Development's proposed water usage. No party argues that the Planning Commission erred in failing to find that the Development's traffic impact would burden a public agency.

Connections's student body was comprised of students primarily from various areas of Hilo and Puna, not specifically the Kaūmana area of Hilo. Connections anticipated roughly a fifty percent split of students from these more distal areas in the future, with an evolving mix of students over time, in light of the additional facilities locations and student population trends. Nor do the facts underlying the first two sentences of FOF 52 appear to be in dispute. "Unusual conditions and needs" have arisen since the land use district was established as an agricultural use district in the 1970s, because the area is now essentially residential in character. The residential nature of the area is apparent from the testimony of the opponents of the Development, as well as the trend in the County General Plan LUPAG (Land Use Planning and Allocation Guide) map designating the area for low density urban use, which is reflected in FOF 52.

Appellants argue, however, that the Planning Commission erred in relying on Planning Commission Rule 6-3(b)(5)(D) as grounds to deny a special permit because the Planning Commission erroneously interpreted it to require proof that the unusual conditions, trends, and/or needs addressed pertain specifically to the immediate vicinity of the subject property. There is nothing in Planning Commission Rule 6-3(b)(5)(D) or the record to support such a restrictive consideration of conditions, trends, and/or needs. In addition, the last sentence of FOF 52 is unclear to this court. It appears to state that this guideline requires a school (or presumably any use) to establish it will

28

service the needs of its immediate neighbors, in particular, to "justify" its specific location. This latter part of FOF 52 is not grounded in Planning Commission Rule 6-3(b)(5)(D) and therefore denial of the special permit for this reason is arbitrary, exceeds the bounds of reason, and constitutes an abuse of discretion.

4. *Suitability of Land for Agricultural Uses*

Planning Commission Rule 6-3(b)(5)(E) provides that the Planning Commission must consider whether "[t]he land upon which the proposed use is sought is unsuited for the uses permitted within the district."

The Planning Commission found as follows:

53. The Land Study Bureau soil classification rating for the Property is "D" or "Poor," which suggests that the land may be unsuited for agricultural uses.

54. Connections is proposing to maintain the upper portion or nearly one-half of the Property for forestry use. In addition, Connections is proposing to construct greenhouses on the Property and conduct an agricultural program in conjunction with its curriculum.

55. Based upon the representations of Connections, it cannot be found that the Property is unsuited for agricultural uses.

CBESS and Connections challenge FOF 55.

The foundational facts here are not in dispute. Although located in an agricultural district, the soil classification for the Property is rated "D" or "Poor." As found by the Planning Commission, this suggests that the Property may be unsuited for agricultural uses. The Planning Director also testified that the Property and its surrounding areas are not in

fact used for agriculture, but have become residential in character. Without further explanation, "[b]ased on the representation of Connections," the Planning Commission found and concluded that the Property is suitable for agricultural uses.

However, the nature of the "representations" alluded to by the Planning Commission is apparent from the record, indeed, from the Special Permit Application itself. The application states that the applicants' request is to "[d]evelop a K to 12 Charter School Campus with dorm facilities[,] intergenerational programs, a sustainable agriculture program and a forestry/conservation program." The petition attached to and supporting the Special Permit Application includes as part of the applicants' objectives "implementation of a forestry/conservation program and a sustainable agricultural program." The proposed use includes "facilities for a forestry/conservation program [and] a sustainable agricultural program" with "green/shade houses [and] a 6-horse barn" on the lower parcel of the Property and roughly twenty acres of the upper parcel used for reforestation projects and no major school facilities. The agricultural and forestry/conservation programs were projected to include about fourteen acres of the lower parcel for agricultural and forestry uses, including for cultivated crops of fruits and vegetables, native trees and plants, and ornamental plants, including greenhouses, hydroponics, aquaponics, and some livestock (chickens, sheep, goats, and horses). Testimony from Appellants' witnesses articulated this vision for the proposed

30

charter school. In sum, Appellants planned to incorporate a robust agricultural component into its use of the Property, while recognizing that a charter school campus is not considered a permitted use with a State Land Use Agricultural District.

The Planning Commission properly considered whether the Property was unsuited for agricultural use because, pursuant to both State regulations and County rules, that is one of the issues that must be addressed by an applicant seeking a special use permit. As the Planning Commission recognized, in significant ways, the Property was in fact unsuited for agricultural use and was not currently used for any of the uses permitted in agricultural districts. No one opposing the permit argued, or offered evidence, that the Property was suited for and should be used for agricultural purposes in what is now a low-density residential area. In a twist of irony, Appellants' vision of a charter school that incorporated and promoted an agriculturally-oriented learning experience for students - hence tending to promote and preserve agriculture in this district and the State, even on unsuited or poorly-suited land - was apparently viewed by the Planning Commission as one of the reasons to deny the Special Permit Application. We note, however, that the Decision and Order is silent as to how the Planning Commission weighed this conundrum. We conclude that it would be an absurd result to read the "unsuited for agricultural use" consideration so strictly and narrowly, particularly under circumstances such as those presented here, to deny a special

31

permit due to an applicant's attempt to incorporate an agricultural component into its proposed use. See, e.g., Morgan v. Planning Dep't, Cty. of Kauaʻi, 104 Hawaiʻi 173, 181, 86 P.3d 982, 990 (2004) (planning commission is required to give effect to the policies and objectives of land use statutes and not to interpret them in a manner that would lead to an absurd result).

Accordingly, in view of the reliable, probative, and substantial evidence on the whole record, and in light of the aforementioned considerations, we conclude that FOF 55 must be vacated in order for the Planning Commission to assess the evidence in this light.

5.  *The General Plan and other Plans*

Planning Commission Rule 6-3(b)(5)(G) provides that the Planning Commission must consider whether "[t]he request will not be contrary to the General Plan and official Community Development Plan and other documents such as Design Plans." Both CBESS and Connections challenge FOFs 59 and 62, which state:

> 59.  The Development, which proposes a charter school that is not specifically intended to service the immediate community surrounding the school, is not consistent with the uses permitted in areas of low density urban use.
>
> 62.  Although the County General Plan Public Facilities-Education course of action for South Hilo encourages the establishment of additional schools as the need arises, the proposed Development, at the subject location, is contrary to the General Plan.

CBESS first argues that the Planning Commission does not have the authority to "interpret" the General Plan and in doing so exercised powers beyond its authority. Whether the Planning Commission exceeded its statutory authority under HRS

32

Chapter 205 is an issue of statutory interpretation reviewed *de novo* by this court. See Malama Maha'ulepu v. Land Use Comm'n, 71 Haw. 332, 335-36, 790 P.2d 906, 908 (1990).

The Charter of the County of Hawai'i (**CCH**) provides that the county council must adopt a general plan, which is to set forth the council's long range policy for the comprehensive physical, economic, environmental, and socio-cultural well being of the county and "shall be designed to assure the coordinated development of the county and to promote the general welfare and prosperity of its people." CCH § 3-15 (2012).[9] The charter

---

[9] All references are to the 2012 CCH. CCH § 3-15 states:

**Section 3-15. General Plan.**

The county council shall adopt by ordinance a general plan which shall set forth the council's policy for long-range comprehensive physical development of the county. It shall contain a statement of development objectives, standards and principles with respect to the most desirable use of land within the county for residential, recreational, agricultural, commercial, industrial and other purposes which shall be consistent with proper conservation of natural resources and the preservation of our natural beauty and historical sites; the most desirable density of population in the several parts of the county; a system of principal thoroughfares, highways, streets, and public access to the shorelines, and other open spaces; the general locations, relocations and improvement of public buildings, the general location and extent of public utilities and terminals, whether publicly or privately owned, for water, sewers, light, power, transit, and other purposes; the extent and location of public housing projects, adequate drainage facilities and control; air pollution; and such other matter as may, in the council's judgment, be beneficial to the social, economic, and governmental conditions and trends and shall be designed to assure the coordinated development of the county and to promote the general welfare and prosperity of its people.
    (a)   The council shall enact zoning, subdivision, and such other ordinances which shall contain the necessary provisions to carry out the purpose of the general plan.
    (b)   No public improvement or project, or subdivision or zoning ordinance, shall be initiated or adopted unless the same

(continued...)

further provides that:

> (a)  The council shall enact zoning, subdivision, and such other ordinances which shall contain the necessary provisions to carry out the purpose of the general plan.
>
> (b)  No public improvement or project, or subdivision or zoning ordinance, shall be initiated or adopted unless the same conforms to and implements the general plan.
>
> (c)  Amendments to the general plan may be initiated by the council or the planning director.

Id.

The Hawai'i County Charter also provides for the creation of the "Planning Department," which consists of the Planning Director and the two planning commissions along with necessary staff. See CCH § 6-7.1.[10] The Planning Director is appointed by the mayor and is the "chief planning officer" of the county and the administrative head of the Planning Department. See id. § 6-7.2(a)-(b).[11] The Planning Director's duties are

---

[9](...continued)

> conforms to and implements the general plan.
>
> (c)  Amendments to the general plan may be initiated by the council or the planning director.

[10]  CCH § 6-7.1 states:

**Section 6-7.1.  Organization.**

There shall be a planning department consisting of a planning director, a windward planning commission, a leeward planning commission and the necessary staff.

[11]  CCH § 6-7.2 states, in relevant part:

**Section 6-7.2.  Planning Director.**

> (a)  The planning director shall be appointed by the mayor, confirmed by the council and may be removed by the mayor[.]
>
> . . . .
>
> (b)  The director shall be the chief planning officer of the county and the administrative head of the department and shall:
>
> > (1)  Advise the mayor, the windward planning commission, the leeward planning

(continued...)

enumerated in the charter and provide, in relevant part, that the

Planning Director shall:

> (1) Advise the mayor, the windward planning commission, the leeward planning commission and the council on all planning and land use matters.
>
> (2) Prepare a general plan, implementation plans and any amendments thereto in accordance with Section 3-15.
>
> . . . .
>
> (7) Make recommendations on rezoning applications, special exceptions and other similar requests.
>
> . . . .

---

[11](...continued)

> commission and the council on all planning and land use matters.
>
> (2) Prepare a general plan, implementation plans and any amendments thereto in accordance with Section 3-15.
>
> (3) Prepare proposed zoning and subdivision ordinances, zoning maps and regulations and any amendments thereto.
>
> (4) Review the lists of proposed capital improvements contemplated by agencies of the county and recommend the order of their priority.
>
> (5) Administer the subdivision and zoning ordinances and regulations adopted thereunder.
>
> (6) Render decisions on proposed subdivision plans pursuant to law.
>
> (7) Make recommendations on rezoning applications, special exceptions and other similar requests.
>
> (8) Render decisions on proposed variances pursuant to law, except that, if any written objections are made to the planning director's actions under this section, said actions shall be subject to review by the board of appeals in accordance with Section 6-9.2, unless otherwise provided by law or this chapter.
>
> (9) Perform such other related duties and functions as may be necessary or required pursuant to law and this charter.

> (9)  Perform such other related duties and functions
>       as may be necessary or required pursuant to law
>       and this charter.

Id. § 6-7.2(b).

As stated above, the Hawai'i County Charter also creates two planning commissions with jurisdiction over their respective areas of Hawai'i County.  See id. § 6-7.3 (Windward Planning Commission) and 6-7.4 (Leeward Planning Commission). The charter provides, in relevant part, that the commissions shall:

> (1)  Advise the mayor, council and the planning
>       director on planning and land use matters
>       pursuant to law and this charter.
> (2)  Review the general plan, its amendments and
>       other plans and modifications thereof and
>       transmit such plans with recommendations thereon
>       through the mayor to the council for
>       consideration and action.
> (3)  Review proposed subdivision and zoning
>       ordinances and amendments thereto and transmit
>       such ordinances with recommendations thereon
>       through the mayor to the council for
>       consideration and action.
> (4)  Conduct public hearings in every case prior to
>       action on any matter upon which the commission
>       is required by law or this charter to act.
>       Notice of the time and place of the hearing
>       shall be published at least ten days prior to
>       such hearing in at least two daily newspapers of
>       general circulation in the county and shall also
>       be distributed via an electronic medium, such as
>       the Internet.
> (5)  Perform such other related duties and functions
>       as may be necessary or required pursuant to law
>       and this charter.

Id. § 6-7.5(a)(1)-(5).

In addition, the Hawai'i County Charter states that "[e]ach planning commission shall review and take action upon applications for land use changes and community development plans involving only property within their respective jurisdictions, other than those involving the general plan[.]"  Id. § 6-7.5(c)

(emphasis added). CBESS argues that this provision, CCH § 6-7.5(c), prohibits the commissions from considering whether a special permit is consistent with the general plan in making their decision to approve or deny a special permit.

The interpretation of a charter is similar to that of a statute and our review is *de novo*. Ford v. Leithead-Todd, 139 Hawaiʻi 129, 133, 384 P.3d 905, 909 (App. 2016). First, it appears that the language used in CCH § 6-7.5 is ambiguous. It states that "[e]ach planning commission shall review and take action upon applications for land use changes and community development plans involving only property within their respective jurisdictions, other than those involving the general plan[.]" CCH § 6-7.5(c) (emphasis added). However, the general plan is created by the council for the entirety of Hawaiʻi County and no public improvement may be made unless it conforms to and implements the general plan. See id. § 3-15(b). Therefore, *every* application for a special permit "involves" the general plan insofar as every improvement must conform to and implement the general plan. Therefore, a more reasonable interpretation is that the Planning Commission does not have jurisdiction over requests to change the general plan. This would be the prerogative of the county council, with the advice of the Planning Director. See id. §§ 3-15, 6-7.2.

This interpretation is also supported by the special permit process as a whole. At least for decisions on special permits for land less than fifteen acres, the only decision maker

on the special permit is the applicable commission. See Planning Commission Rule 6-8. The Planning Director's role in special permit applications is to ensure that the application is not processed if it is "incomplete" as to "form and content" and to provide his or her own recommendation. Id. at Rule 6-4; see also CCH § 6-7.2(b). We reject CBESS's argument that the Planning Director has the responsibility under Planning Commission Rule 6-4 to reject an application if he or she believes the special permit application is contrary to the general plan. The rule does not provide that authority because whether the permit should be granted on the merits is not a decision on whether the application is "incomplete" as to "form and content." The Planning Director is charged with making a recommendation on "special exceptions and other similar requests," but he or she has no role in deciding on the merits of the particular application. See CCH at 6-7.2(b).

In addition, HRS § 205-6(c) provides that the Planning Commission has the discretion to grant a special permit "only when the use would promote the effectiveness and objectives of [HRS Chapter 205]." The general plan is one of the means used to further the objectives of HRS Chapter 205. See CCH § 3-15 (general plan sets forth the council's long-range policy for the comprehensive physical, economic, environmental, and socio-cultural wellbeing of the county and "shall be designed to assure the coordinated development of the county and to promote the general welfare and prosperity of its people"). The general

plan is repeatedly referenced and used in Chapter 205 as part of the planning and development process. See HRS § 205-17 (county general plan one of the criteria to be considered by the LUC regarding district boundaries); HRS § 205-2 (same); HRS § 205-18 (county general plan reviewed every five years to review classification and districting of lands in the State). HRS § 205-6(c) authorizes the Planning Commission to consider the general plan in making a permitting decision, as the general plan is one of the tools used to set out the objectives of HRS Chapter 205, and the Planning Commission is required to find that granting a special permit promotes the effectiveness and objectives of that chapter. Accordingly, CBESS's contention that the Commission exceeded its authority in interpreting the general plan is without merit.

Connections also argues that the Planning Commission's finding that the Development would be contrary to the general plan is arbitrary, clearly erroneous, and against the weight of the evidence. The Planning Commission found that the general plan designates the Property for "low density urban use," which includes "residential, with ancillary community and public uses, and neighborhood and convenience-type commercial uses." The Planning Commission concluded that the Development is not "specifically intended to serve the immediate community surrounding the school" and, therefore, "is not consistent with the uses permitted in areas of low density urban use." No additional explanation is provided.

The general plan describes three types of "Urban Designations" based on density as follows:

> High Density:  General commercial, multiple family
> residential and related services. . . .
> Medium Density:  Village and neighborhood commercial
> and single family and multiple family residential and
> related functions. . . .
> Low Density:  Residential, with ancillary community
> and public uses, and neighborhood and convenience-type
> commercial uses. . . .

County of Hawai'i General Plan (**General Plan**) at p. 14-7 (2005).

Four additional types of urban designations are listed that are not relevant here for resorts, industrial areas, etc. Id. None of the urban density designations expressly mention elementary or higher education schools as permitted in those areas. However, the Planning Director testified that Hawai'i County does have schools in both urban and agricultural areas. It is unclear why a public charter school, which would eventually include children from the neighboring communities, estimated at fifty percent from the Hilo area, is not an ancillary "public use" and, therefore, consistent with the low-density urban use designation.

The Planning Commission then stated that the general plan instructs that the Planning Commission must consider community concerns in making its decision, citing three general "goals" set forth in the General Plan:

> Economic Element - Goal
>
> "Provide an economic environment that allows new,
> expanded, or improved economic opportunities that are
> compatible with the County's cultural, natural and
> social environment."

Public Facilities Element - Goal

"Encourage the Provision of public facilities that effective service the community and visitor needs and seek ways of improving public service through better and more functional facilities in keeping with the environmental and aesthetic concerns of the community."

Land Use Element - Policy

"Encourage the development and maintenance of communities meeting the needs of its residents in balance with the physical and social environment."

General Plan at 2-13, 10-1, and 14-14. The Planning Commission found that, even though the General Plan encourages the establishment of schools in South Hilo as the need arises (see General Plan at 10-7), due to the significant community concerns expressed regarding the Development, the granting of the Special Permit would be "contrary to the General Plan." Id.

However, a plain reading of the General Plan does not forbid or even discourage the building of school facilities in low density urban areas. There is no satisfactory explanation provided as to why building a school in a low density urban area is contrary to the General Plan. The general goals of the General Plan stated above do not support the proposition that community concern generally can serve as a veto over a special use permit. How much "community concern," however calculated, is required before a special permit is found to be contrary to the general plan is unclear and is ripe for arbitrary and capricious abuse. Given the sparsity of factual findings or explanation in the Planning Commission's decision, this Court has no way to meaningfully evaluate the Planning Commission's conclusion

41

regarding the permit being contrary to the general plan. See
Kauai Springs II, 133 Hawai'i at 164, 324 P.3d at 974 (an
agency's findings should allow the reviewing court to track the
steps by which the agency reached its decision). Without
additional findings by the Planning Commission, the Planning
Commission's FOFs 59 and 62, finding that the Development would
be contrary to the General Plan, are arbitrary and capricious.
COL 5, stating that the Development is not consistent with the
County General Plan, must also be vacated.

> D. Further Challenges

Both CBESS and Connections challenge FOF 63, which
states:

> 63. The construction of a school on the Property is an
> unusual use of the land because a school is not a
> permitted use in the State Land Use Agricultural
> District. However, the evidence presented does not
> demonstrate that the Development is a reasonable use
> of the Property. Specifically, Connections has not
> demonstrated how this school can be built without
> sufficient potable water resources. Nor [ ] has
> Connections demonstrated how the development of a
> regional charter school on the Property that does not
> specifically service the needs of the immediate
> community and that is overwhelmingly objected to by
> the immediate community is a reasonable site for this
> facility. In addition, Connections has not
> demonstrated that the Development meets most of the
> criteria to be considered by the Commission in the
> subject application.

CBESS also challenges COL 4, which states:

> 4. The Development does not adequately meet the
> requirements or guidelines for a special permit as
> required by Section 205-6, HRS and Rule 6 of the
> Commission Rules.

The Planning Commission has wide discretion in deciding
whether to approve a special permit and must consider each of the
factors set out in its rules to determine whether the granting of

the special permit is warranted. As explained by the Planning Commission in its Answering Brief, the Planning Commission did not base its decision on any single criterion; rather, it was based on the totality of the evidence when applied to all seven criteria. In this light, and given our conclusions above regarding various errors and insufficiencies in the Decision and Order, FOF 63 and COL 4 must be vacated, and it is necessary to remand the case to the Planning Commission for further proceedings. See HRS § 91-14(g) (appellate court may remand the case with instructions for further proceedings; see also Lanai Co., Inc. v. Land Use Comm'n, 105 Hawai'i 296, 316-17, 97 P.3d 372, 392-93 (2004) (remanding to LUC for additional findings and conclusions and further hearings if necessary).[12]

V.    CONCLUSION

For the foregoing reasons, the Circuit Court's July 14, 2015 Order Affirming and January 13, 2017 Final Judgment and the Planning Commission's May 12, 2014 Decision and Order are

---

[12]    Although not raised as a point of error on appeal, Gomes argues that the Planning Commission failed to consider its public trust obligations with respect to the Property. See generally Mauna Kea Anaina Hou, 136 Hawai'i at 403-09, 363 P.3d at 251-57 (discussing the public trust doctrine under Article XI, Section I of the Hawai'i Constitution). As a special permit was not approved, notwithstanding any other arguments concerning the Planning Commission's public trust duties, it appears that the Planning Commission can address the requisites of the public trust doctrine on remand. See id. at 408-09, 363 P.3d at 256-57.

vacated, and this case is remanded to the Planning Commission for further proceedings consistent with this Memorandum Opinion.

DATED: Honolulu, Hawaiʻi, January 31, 2020.

On the briefs:

Ted H.S. Hong,
for Applicant-Appellant
 COMMUNITY BASED EDUCATION
 SUPPORT SERVICES.

Holly T. Shikada,
Gregg M. Ushiroda,
Carter K. Siu,
Deputy Attorneys General,
State of Hawaiʻi,
for Applicant-Appellant
 CONNECTIONS NEW CENTURY
 PUBLIC CHARTER SCHOOL.

D. Kaena Horowitz,
Angelic M.H. Hall,
Deputies Corporation Counsel,
County of Hawaiʻi,
for Appellee-Appellee
 WINDWARD PLANNING COMMISSION,
 COUNTY OF HAWAIʻI.

Michael J. Matsukawa,
for Intervenor-Appellee-Appellee.

Presiding Judge

Associate Judge

Associate Judge